May it please the Court, good morning. Your Honor, this is Mike McKibben for Plaintiff Richard Heinemann. Good morning. The only disputed issue in this case really involves how to compute pre-disability earnings in Mr. Heinemann's case, and also that affects the resulting benefit amount. AIG, instead of using his full salary of $90,000, used a reduced earnings figure of only $45,000. And that's an amount that corresponds with what he was paid off and on during certain periods in the year 2001 when he was working half-time, struggling to get back to work following a heart transplant operation. AIG justified this by classifying him as a part-time employee during that period of time. And the District Court upheld AIG's decision, but it applied a different rationale. The District Court found that the date of onset of Mr. Heinemann's current cognitive impairment was December 11, 2001. And then it held that whatever he was earning on that day constituted his pre-disability earnings, despite the fact that his earnings had been drastically reduced because of his physical ability to work full-time as of that day. This is a unique case because we have successive, overlapping, unrelated causes of disability, one of which was admittedly pre-existing. But we have an ongoing state of disability since December 6 of 1999. So it's our contention that to determine what Mr. Heinemann's true pre-disability earnings were, let's go back to December 6, 1999, because he has met the plan definition, both policy definitions of disability since that day. So if he had, when he went out on December and he took a year off, didn't he? When he had his heart conditioned, he was off for a year, wasn't he?  Yes. Okay, and that was with or without pay? That was without pay. Without pay. And that was started as of what date? December 6, 1999. That's what I thought. Okay. So as of December 6, 1999, his rate of pay was $90,000 a year. Yes, Your Honor. All right. But he went for a year without, but he was disabled. They recognized him as a medical disability. But because it was a pre-existing condition, it was not a long-term disability qualifying disability. Is that correct? He would not have qualified for long-term disability benefits during that period of time. Benefits, right. Because it was disability, but it wasn't a qualifying disability under the plan because it was a pre-existing condition. That's correct, Your Honor. However, I would submit that he did meet the plan definition of disability. I'm not arguing that. I'm just trying to play. Okay, so then he comes back roughly at the beginning of 2001, I believe. Yes. There's some dispute as to the precise date of return to work, but as best we can figure out, about January 18, 2001. Yes. Okay, so he comes back in January 2001. He works essentially half-time. There's, well. Whatever. I mean, he works less than full-time. He never was able to put in a full day's work after that day. And he is earning, take home, half-pay. That's not clear, Your Honor, for the first pay period. All right. Because it's Mr. Your argument is that there was a month in which he was getting full $90,000? Calculated at that rate? No, Your Honor. I think it would be my argument that it appears that he may have been paid at his full rate for the first pay period. Which would have been about a week. Annualized to $90,000. Annualized to $90,000. Or working backwards, he had a $90,000. They'd annualized his salary rate at $90,000. That's what you're trying to say was the wage rate in effect at the time of disability. Absolutely, Your Honor. So what I'm trying to understand is where you need to get back to in order to and how you get there. And it's my understanding you have two theories. One is that his rate of earnings was always $90,000 and it was simply reduced to reflect his part-time or less than full-time status. So that the rate of earnings was $90,000 immediately preceding the disability. Or that the time of disability was back in December 1999 and that's the disability that counts and you look to $90,000 there. Am I understanding your argument? My argument would be, Your Honor, that when he reduced his hours to half-time for half-pay, at that point he fell under the Subsection 3 definition of residual disability under the AIG policy, the Liberty Mutual policy would call that partial disability. But the reason was because he had an accommodation arrangement with his as he was able to put in a full day's work. It was never the intent that he be classified or reclassified as a part-time employee. It was carried on the books as a regular employee. What was his scheduled rate of earnings? Well, half of his regular salary at that point, which would be $45,000. So that's what the plan talks about and uses that term. It's a term of art, isn't it? Well, the issue then would be if you're determining what pre-disability earnings are, is it pre-disability before you meet the definition of disability or does it somehow change after that if you try to work reduced hours because you're physically unable to put in a full time or a full day's work? Well, here's the thing. I think maybe all of us have been wrestling with this. I'm trying to catch up with you guys who have been litigating it. Basic monthly earnings are defined in the plan as the, quote, now basic monthly earnings is a defined term, basic monthly earnings. And then itself is defined as the insured's monthly rate of earnings from the employer in effect just prior to the date disability begins. I look at the language as a contract matter and I'm wondering why does basic monthly earnings get defined in terms of monthly rate of earnings? Why aren't basic monthly earnings simply basic monthly earnings, what you earn, but instead the plan uses the term rate of earnings? And I was understanding your argument to be that his rate of earnings was $90,000 and that what happened post-December 1999 was that he was on an arrangement from which the compensation that he earned, in fact, was a reduction from his, quote, monthly rate of earnings. They dispute that. They're trying to argue that, no, rate of earnings is what he actually took home. So help me out here. If that argument is correct, Your Honor, if I can just pose a hypothetical. If he had, while he was on his leave of absence, as connected with the heart transplant operation, there is no dispute, as I understand it, that he was covered under the plan for long-term disability coverage, that premiums were paid, or at least it appears that they were paid. During that period of time that they weren't paid, they were specifically waived. I think there's some conflict in the evidence about that. But at any rate, he was covered for long-term disability, even though he was not entitled to any benefits for his existing disability because of the pre-existing condition. The previous rate. No, go ahead. I'm just... So if he had been, as I said in my brief, struck by a truck while crossing the street or hit by a bolt of lightning and rendered totally disabled as a result of those injuries, even though he makes a full recovery from the heart transplant, if he's still rendered disabled, what would his benefit be? It would be zero because his rate of earnings would have been reduced to zero by virtue of the fact that he wasn't receiving any money. So I guess where I struggle with this case is if he returns to work, and if the intent is to return on a full-time basis, and he finds that he's not able to do that, so he reduces his hours to half-time, why should he be penalized for doing that? Because either his earnings would be zero if he had been rendered disabled in the truck altercation, or it would be based on his full salary of $90,000. I think it's more logical that it would be based on his full salary of $90,000. Otherwise the coverage is illusory, and he doesn't have any coverage. Okay. Could I ask you, could I take you to the district court's decision? And you started off by talking about the onset of disability, and that was essentially the date that the district court used for both, for determining the rate of pay and when the $45,000 would start, the benefits. Is that a – so the district court here was reviewing de novo what the insurance company did, correct? Yes, Your Honor. So the district court had to issue findings of fact. Now, the district court said as a finding of fact that the onset was, I forget what the – December the 11th, 2001, Your Honor. Right. Okay. Why isn't that – you have to – to challenge that, you have to, I think, persuade us that it's – that that finding is clearly erroneous. Well, the – Why is it clearly erroneous in light of all the – what evidence would you point to that suggests that that's clearly erroneous? That date corresponds only with one – with the date that Mr. Heinemann first consulted, a neurologist, Dr. Engstrom, and a neuropsychologist, Dr. Koenig. That's all – that's the only thing you could point to that happened on that date. He first saw specialists who were able to competently diagnose this condition after doing a number of tests, an MRI, neuropsychological testing, and they were finally able to render a competent diagnosis. But prior to that day, he had made ongoing subjective complaints of fatigue and cognitive difficulties to his treating cardiologist. His treating cardiologist apparently mistakenly believed he would eventually recover, that these were heart-related problems, not related to what ultimately it was determined to be, which was a brain-based disorder caused by a stroke. So there is subjective – or evidence of subjective complaints to his treating cardiologist throughout 2001, but it took about a year before the cardiologist referred him to specialists who could competently diagnose his condition. I think the case law is fairly clear that the date of diagnosis is not necessarily the date of onset of disability. But what evidence points to – you know, the district court had to make a factual call, and he did. And you're telling us, well, that was clearly erroneous. It should be some other earlier date. Yes. What date do you suggest and why? What evidence would suggest a different date? Well, the district court is trying to determine apparently the date of onset of the cognitive disability. I'm saying that we have a case involving successive overlapping unrelated causes of disability with an ongoing state of disability. I think that's where we part terms, because I don't think you can parse a disability where you have overlapping unrelated causes, but the person is never not disabled. So for purpose of the onset of – assuming you're right on the $90,000, that his benefits should have been paid at the rate of a $90,000 annual salary, what is the onset of the date of this new disability? The new cause of disability. The new cause – The new explanation for his disability. The district court was acting as the finder of fact here. It had to make that determination. So what other date should it have been? All I can say in response to that, Your Honor, is that there's no medical evidence in the record that supports that date. What is a district court judge supposed to do? Well, the – Follow the law. We have a district court judge here. The plan's own reviewing neuropsychologist, Dr. Taylor, found that Mr. Kineman had clear disabling impairments as early as January of 2009. Now, would that be – is that sufficient? Is Dr. Taylor's analysis – is that sort of like – he at least pinned down. He picked, like, February the 7th or something like that as a date. Yes. Is that more convincing than what the district court did, the date of diagnosis? Yes, because no evidence supports what the district court found. None. There's no evidence in the medical record that would suggest that Mr. Heineman's cognitive problems started on December the 11th, 2001. Dr. Engstrom – Do you think the district court just overlooked that? Or do you think the district court looked at it and said, well, there's all this other evidence and, you know, it's just – this is just – there's too much going on here with this fellow. He was very ill. He was very sick. He had a lot of problems. Medication. Extra medication. You know, all these issues. All bladder surgery. You know, it went on and on and on. It was terrible. From reading the district court's findings, in fact, I was unable to determine why the court elected that – to pick that date of December 11th. The only explanation that the district court gave was that that's the date that Mr. Heineman first – they said sought treatment for his fatigue and cognitive impairments, which in and of itself isn't true because the – or correct, because the evidence in the record clearly shows he did make ongoing complaints to Dr. Haaslein, his cardiologist, throughout that year. So he sought treatment. He just didn't get treatment. But didn't – was there any – wasn't there some conflict as to – between the different doctors as to whether or not part of the problem may have been from medication, from the heart issues, and that although there was some cognitive disability, possibly a stroke, that there was a difficulty in trying to discern by the court, I would think, when would you – how would you set a date? When was it absolutely certain that someone had said it is a cognitive disability to the exclusion of anything else? And it seemed to me the district court may very well have picked that date because trying to go back and figure out between these experts as to when it actually started is pretty much a possibility. You could always, I guess, put it back to a question of fact, but I don't think that anyone would really be able to discern exactly when it began,  and therefore the court probably picked that date because that is something, in fact, where they said it really doesn't relate, have anything to do with the heart issues, which would have been preexisting. Yes, I think it would be impossible to pick a precise date of onset of the cognitive problems because Mr. Heinemann did not know he had a brain-based disorder. Assuming that it was caused by a stroke, he didn't know he'd suffered a stroke, and no one knew until they did an MRI in December of 2001, and Dr. Engstrom was able to diagnose that there was a brain-based disorder at that time. But even he said that it's clear from the MRI that this was not of recent origin or that this was evidence of an older condition. It wasn't recent. Well, what you're basically telling us, I believe, is that the judge was in error, but you don't know how the judge could be correct, or you don't know what the answer would be. I look at, you know, at what point in time did Mr. Heinemann not meet the definition in the plan of disability? Can I pick any point in time when he didn't meet that definition? The only point in time I could come up with was prior to December 6th of 1999 when he left work due to the heart-related problems because he never got better after that. Well, it seems to me that there's a difference in the way you look at it. The way I understand it is that you had the heart problem, which was a preexisting issue that would not be covered. You had the cognitive disability, which is separate and distinct, and that would be. However, it seems to me under the plan that there is no requirement, although tell me if you think there is or isn't, it doesn't seem as if there is a requirement under the plan that the amount of payment is affected by the virtue of the difference between the preexisting issue and the cognitive disability. What I'm really trying to say is that from the payment standpoint is concerned, disability started potentially in December of 1999. He was disabled all the way through, all the way up to the point that, apparently now too, but up to the point where he actually then totally quit work, and then at that point you had the long-term disability as determined based on the cognitive disability. Therefore, what you're talking about appears under the plan that there was a disability that went all the way through, but he only was capable of obtaining long-term disability when it was unrelated to the rate of, excuse me, unrelated to the preexisting condition. Therefore, I think the judge was pointing out that the cognitive disability began at a time that he could define it in some concrete way, and that the amount of pay is separate and distinct from the issue of disability because the disability itself runs from, it seems, it runs from December all the way through the end. I guess the question is also whether or not the long-term disability, which is totally different, the cognitive problem, totally different from the heart issue, whether that can be bifurcated, should be bifurcated or not, and that would make a difference as to whether, in my opinion it seems to be, make a difference as to whether or not he would take the $45,000 or the $90,000. Yes, I don't see how that could be bifurcated or parsed into separate disabilities, especially if he's suffered a reduction in earnings as a result of an ongoing impairment, whatever the cause of the impairment. If he's working reduced hours or if he's working zero hours, if it's because of a physical impairment, and if he meets the definition of disability, then whatever, if he goes back to work for two weeks and earns two weeks of pay, does that then become his new predisability earnings? If so, he's punished for his efforts to return to work. I've run out of time. Yes, we'll give you a little time on rebuttal. May it please the Court, my name is Robert Cooper. I represent the appellee. The most fundamental problem with this appeal is that plaintiffs simply can't show that any sort of reversible error took place. That's for us to decide. Why don't you address the substantive issues we've been wrestling with? In order to respond to Judge Pais' question regarding the date that plaintiffs are articulating is the onset of his disability, first I'd like to point the Court to the opening brief, page one. On that page, plaintiff specifically says that his disability commenced as early as February 7, 2001. That just happens to coincide, is that wrong? Oh, yes, that's what the date that, isn't that the date that James Taylor? Yes, and so. Mr. Taylor, or Dr. Taylor I should say, he's not a medical doctor, PhD, who I guess was employed by an insurance company, looked at, made an independent review of all the records. Correct. Because I understand what he did. And he did a report to Susan Mills, and he starts off in his first paragraph and he says, there's clear evidence that identified neurobehavioral impairments and work-related limitations occurred prior to 118-01. And then he goes on and he says a little bit about the situation, and then he says, although this conclusion may be difficult to validate, I'm sorry, he goes to the end of the history section and he says, Hyman is a 59-year-old male whose date of disability is 2-7-0-1. Correct, so let's take that date, February 7, 2001. The question becomes, what was his predisability earnings right immediately preceding February 7, 2001? What if it were zero, because he wasn't at work? Well, it depends on... He gets no disability? It depends on why he wasn't working. If he's not working because of an excluded cause, such as... He gets zero. Excuse me? Deal with the truck hypothetical. He goes off, as he did, for, beginning December 99, he goes off work for unpaid medical leave because he has a disability, but it's an uncovered disability under the policy because it's preexisting. He gets hit by a truck, is paralyzed, can't come back to do his work, still on the payroll. Long-term disability or not? No, because it's at the time immediately preceding it, he had an excluded. No, the new cause of... No, he's recovered from his heart problem. But for the truck accident, he's not... His heart's back in shape. His legs don't work. He can't manipulate his hands. He can't do the work of a computer software engineer. It has nothing to do with his heart. It has to do with the fact he got hit by a truck. Okay, so he's recovered from the disability that caused him to get the medical leave in the first part, uncovered by LTD because it's preexisting. He's still on the payroll. He's due to come back in January. The day before he shows up, we'll change it slightly. He gets hit by a truck. He's all set to come back. Now he's, unfortunately, definitely totally disabled, unrelated, none of this uncertainty about whether it's cognitive or anything, a clear accident. He's now long-term disabled on a qualifying basis. What's his benefit? In that case, there would be none because he never came back in order to get back on the payroll. But to answer the question... He gets hit on the way to work. He's on the payroll. He shows up. He's driving to work. He gets hit in an accident. He's on the payroll. Payroll started January 1. He's on his way January 3. Still no benefit? It doesn't matter whether he worked one minute or the entire two-week period in January. As long as he's working, that's fine. Even if he only works for one minute, then he will be able to get the benefits. So then it would be based on his rate as of January 1. Right. We're not saying that he has to work the entire two-week period for the first pay period in January. So, in other words, even if he only worked for two minutes and he had a heart attack or some other... Okay, but if he gets hit going to the Rose Bowl, I'm sorry, and he gets hit coming home on the way to a New Year's Eve party on December 31st before he's back on paid status on the payroll, then he doesn't get any benefit. Right, because if you look at the payment, the rate immediately preceding that is... Zero. Correct. Notwithstanding, he's always been carried on the books as a salaried employee at $90,000. And just not working because on medical leave. Well, again, it depends on whether it was excluded or not. In that hypothetical, if it is excluded, then it doesn't... It's not excluded. We're talking about what his pay was. His rate of pay on the books of the company was $90,000. Correct. Okay, and the plan does not define his earnings in terms of just simply his basic monthly earnings, as I read to counsel. It doesn't define it as what he took home in his paycheck, which is basic monthly earnings. Instead, it says, defines it as his monthly rate of earnings. What's his monthly rate? Well, in this case, his... What does rate mean? Why does the plan insert the word rate? Because the plan takes into account the fact that employees have different adjustments to their compensation throughout their employment. Yes, such as... You could have a raise, you could have... You could have a rate of $90,000, but you could be paid more or less than that, depending on the particular adjustment. But your rate of earnings is the rate on the books. Is that what you're saying? What I'm saying is that the plan has to take into account the flexibility that compensation changes based on promotions and demotions. You can't just base the computation of the benefits on just one inflexible amount for the entire period that a person is employed. Well, what does... Why doesn't basic monthly earnings reflect... You say when he comes to start work, restarts work, it's going to be whatever... He doesn't have to work more than a minute or whatever in January. But I'm just trying to understand. If the employee has a rate, which this employee did, of $90,000 annualized, that was his rate, in effect. Isn't that correct? As of what time? During the time... Well, let's see. As of the time there's a... What is it? ER-180, there's a calculation made. It says Richard Heinemann, current salary, $90,000, ranking 3%, increase 0% because he was not working full-time. But that's... The company calculated, as I understand it, that his current salary was $90,000. He wasn't being paid, in fact, $90,000, but that was his base rate. That's not true. That's actually just handwritten notes by Mr. Heinemann. These are typed. It says Richard Heinemann, current salary, $90,000. That's not a company... Well, it's attached to a two-page performance review, but there's no indication that the performance review was more than two pages other than the handwritten note by Mr. Heinemann. This isn't handwritten. That's what I'm saying. It's printed. If I could just show the court... Okay. Visual 8, this is part of the record. It's a copy of the payroll record that we put in the supplemental excerpts of record on page 9. It specifically identifies that Heinemann was getting only the $45,000 salary as early as January 26, 2000. Yeah, but how is that calculated? 1730, that basically means that he was getting $45,000 rather than... How did they arrive at that number? That's just what he was paid based on... How did they get there? What was in the yellow? What were those figures based upon? How did they arrive at that monthly rate? You mean whether it's 90 versus 45? Yes. It's $90,000 divided by the number of months, isn't it? Correct. Okay, and how did they get to the green rate? $45,000 divided by the number of months. So they just dropped his monthly rate from $90,000 to $45,000 and divided that by 12. Correct. That's the payment arrangement that he himself had. It's not a number that was fabricated by each rate. I'm not saying it was fabricated. He asked for that, right? Correct. He said, look, I can't justify my full $90,000 rate. Exactly. So the rate, then, is what the company carried him on the books as. As of January 26th. That's correct. So the company records reflect that his annual rate was $45,000. As of January 26th. That's absolutely correct. And preceding this page on SDR-9, I've included the fax cover sheet, which is SDR page 8. That's the human resources faxing a copy of the payroll records to AIG, saying here's his employment history confirming that he was making only $45,000. Okay. If you can hold that up again. Sure. This is what I'm trying to understand. If, in fact, okay, well, it looks like he dropped that. Why did it go down to $173.04? It's $1,730.76. That's the $45,000 figure. Well, what's in green? It's hard for me to see because my Lasik surgery is wearing off. It goes up to $17, but there's a period of time where it says salary at $170. What's that? You know, that? Yeah, $965, whatever. That was apparently for just one day of work that he did, as opposed to a full two-week period. So what was his rate then? For the full two-week period, he was getting $1730.76, which is $45,000. Okay, so the rate, that's what rate means in the plan, right? It's the rate. And then what he actually takes home in a given week is based on whatever he actually does during the week. So if I work at reduced number of hours, apparently, as he did for a period of time, is the argument that his rate, his basic monthly earnings, are what he actually got paid during the week interval before he was injured and the long-term disability was caused, or is it the $45,000? It's the amount that he actually took home. Okay, so hold that back up again. Sure. He gets hit. His rate is $45,000. He gets hit on whatever the day, one of those days, you know, he's making less than the $1,700. So the week that, what's the bottom number? I can't, you're going to have to read it to me, or bring it closer. Okay, now I can see it. $865,000 is the number rounding off. Okay, $865,000. Correct. All right, now he gets hit the day after, while he's getting those two weeks of $865,000, he gets hit and disabled during that time period. Is his rate, for purposes of calculating his long-term benefit, $865,000 times whatever that comes out to be, or is it $865,000? Well, the $865,000 is based on $1,730,000. It's the same thing. No, it isn't. What he took home that week was $865,000. You just told me that his number would be calculated on what he actually took home. He's not taking home $1,700. He's taking home $865,000. That's right. Okay, so is what his benefit going to be calculated on $865,000? If he were to be hit the day after he took home $865,000, yes. Okay. But that's not what happened here. I'm trying to understand how the plan works, sir. It's very complicated. And you're telling me that the rate would be calculated for benefit purposes $1,730,000 in the normal course of that year, but if he happened to get hit in the period where he's only taking home $865,000, then his benefit would be calculated at $865,000. Correct. And that's what rate of pay means. And in this case, our position is that the reason it doesn't make a difference is because even if we adopt the position that Plano articulates, namely that the disability began as early as February 7, when you look at the pre-February 7 amount, it's $1,730,000, which corresponds with $45,000. But if it goes back to the date he was disabled, which is back in 1969, the rate was $90,000. You mean 1999? I'm sorry, 1999. Correct, except the only problem he has is that the 1999 rate was based on an excluded cause for heart-related problems, and that's undisputed. No, it wasn't. There was no rate. His rate was based on what he was doing pre-disability. He wasn't earning $90,000 based on a heart problem. He was paid at $90,000. His disability when he went off was because of the nonexcluded, but he was on disability, wasn't he not? He was eligible to receive benefits as long as the cause of the disability was a covered loss. He was on disability. Correct. He was disabled. He was disabled. Okay. Let me ask you, does the plan indicate that a person that is disabled for a pre-existing condition, that the disability itself is not counted if at a subsequent time, such as in this case, there's a cognitive disability which is covered? Are you saying the plan precludes the fact that disability, whether it be one form or another, that there is a difference? There is a difference. And the plan on page ER 137 says that the partial disability must result from the covered cognitive problem as opposed to the excluded cardiac problem. In other words, if you have a reduction in terms of your salary, as long as the reduction is due to a covered cause, that's okay. You're still going to be disabled and you would be entitled to benefits. The problem he has in this case is that the reduction that he had in January 2000 was due to an excluded cause, which was the cardiac problem, and that's undisputed. So what they're trying to do is they're trying to get around the pre-existing exclusion by relying on the partial disability. And you're saying the plan says that specifically? It's on page 137. In addition, on the CD-13, that's a contract document, page 13, that I sent to the court in response to the court clerks. I'm not sure. You say he's trying to get around the – he's not. It comes down – it's calculating the monthly benefit that he's entitled to, which is different from whether or not what triggers the payment of the benefit. He is disabled as of December 1999. He is not getting payment in 2001, or whenever the onset date is, to all the way back for all of the time that he was off work back to 1999. The question is, was he disabled as of December 1999, and is that the date on which you look to see what his rate of pay was before disability? That's in the language of the plan, does it say, that if in the course of being off work due to a disability, he is further disabled and disabled by a covered disability, that you don't go back to the date on which he became disabled? It's on page 137. The definition of disability indicates that the insured is unable to perform the material duties of his occupation and he's earning currently at least 20% less per month than his indexed pre-disability earnings due to that same injury or sickness. That's the critical part, and that's why I believe he's trying to get around the pre-existing exclusion because he completely ignores the requirement that you have to correlate and match those two disabilities together. You can't have one that starts with an excluded cause and use that as a basis to trigger the partial disability benefits. And he never even acknowledges that critical portion of that language. And I think that's why his entire appeal is completely flawed. But in addition to that... I know your time is up, but I do want to ask you, why isn't the district court's finding regarding the onset of disability clearly erroneous in light of Professor Taylor's analysis here? All he said was he acknowledged that there had been documentation in the file that indicated that that was the date. But again, it's a harmless error. Even pretending that it was an error, it would be harmless here because if you go back to the February 7 date, the amount he was making immediately preceding February 7 was at the $45,000 rate. And the reason it was at the reduced rate was because of his cardiac... So assuming that the disability... Putting that aside for a minute, but just the onset, you're saying that for Mr. Hyman, no matter what, the onset date is of no significance? Exactly. If the onset were to go back, if you look to the immediately preceding rate, it would be $90,000. Well, if you go back to $99,000, then obviously it would be different. But that's where he would have to go under your reading. Right. And the reason he can't do that is because he's... What he's saying is that we should go back to February 7, but based on the payroll records that is undisputed in the record, he was making only the $45,000. So the onset date of February 7 only becomes important if the rate of monthly... if the annual rate is $90,000? Which it was not. I said if. Well, it becomes important, but that doesn't mean it becomes automatically reversible because as Your Honor previously indicated, this is a highly differential standard of review, and at most we would have two permissible views of the evidence, which by definition precludes finding that the... That wasn't my question. I'm not sure that the district court decision adequately accounts for Taylor's analysis. It's pretty regular and pretty common for experts to disagree just because one particular doctor... They didn't testify in front of the district court, though. This is a record review case. Correct, but even then, especially in ERISA cases, you almost always have a situation where the patient's doctor contradicts another doctor. Well, in that situation, the district court has discretion to take live testimony. Correct, but again, given the highly differential standard of review... No, we'll just... I want to make sure I understand the relevance. You said it was harmless, but then you're saying maybe it's not harmless if the rate pre the February 7 date was other than $45,000, and you say it clearly wasn't. I understood counsel to argue that it's undisputed when he came back to work and what his rate was. I understand that plaintiff seeks to obfuscate that issue by advocating that there's dispute, but if you look at the record, his own letter says that he only worked 20 hours in January, and I have the citation. It's on ER-283. He himself says that he only worked 20 hours in January and that they only paid him at that reduced 20-hour rate. That's his own admission. He's conceding that he only got paid at the reduced rate in January. If he had worked 40 hours, he would have been paid then at the rate commensurate with $90,000. If, yes. Was it agreed when he came back that he would only work 20 hours? That was his arrangement. That's basically what he said. No, I'm sorry. You mean the company is the one that allowed him to come back to work. Under what terms and conditions did he return to work? Not what he could do, but what was he hired, rehired to do, if you will? Was he coming back to work a full 40-hour week, which turned out that he couldn't do, or was it up front agreed that he would satisfy his work obligations entirely by working 20 hours? The correspondence that he sent seems to indicate that his arrangement was that he would only do half of the work because that's all he was considered to be capable of doing. Oh, that's the other. Okay, fine. And the only other point I just wanted to raise is that plaintiff's counsel indicated that we're trying to punish him for trying to go back to work in January 2001. That's totally not true, and the reason is because assuming all the facts were the same except that when he left in 1999, that was due to a cognitive problem, which we admittedly admit was covered, then he would be getting $90,000. The problem here is that when he left in 1999, it was due to an excluded card. So unless the Court has any other questions. Thank you, Your Honor. Thank you. Mr. Frank, go ahead. You have a couple minutes. Would you address this issue? If you can't get back to December 1999, what's your theory that you get the $90,000 by virtue of the onset date being different from what the district court found? I cannot clearly point to evidence in the administrative record that would establish another date at which he was paid. He actually received pay at the $90,000 rate. It was his recollection that he returned to work on or about the 18th of January of 2001. And on the visual aid here, if I can. Yeah, go ahead. We have a date here, which is a check date. Bring it over so you're on the mic. A check date of January 26th of 2001, which would be approximately eight days after that. But that's not the end of the pay period. That's just the check issue date. The problem is I can't determine how many hours are encompassed by this 1730-76 here, whether that's one week's work or two weeks' work. Well, I don't know why we're arguing about that issue. You had a trial, so this is something that would have been argued in the district court. We can't. That point wasn't raised at trial, Your Honor. The wage rate, in effect, the earnings rate, not wage, the earnings rate, in effect, immediately prior to the disability, says, A, you've got to find out what the onset date, and, B, you've got to figure out what the rate was. And if the record doesn't establish, assuming that you want the onset date to be February 01, but the record is muddied as to whether it was a rate other than 50% of 90,000 and then he worked less than the 50% time, I don't know. That's the trouble I'm having. Well, yeah, I've never been able to point to any clear evidence as to what the onset of the cognitive impairment. I'm just saying if you accept February, if we were to say it's earlier than December at the end of that year. The onset date of the cognitive impairment could well have been February of 2001 or earlier than that. I'd say it's February 2001. How does that help you? That's what I'm trying to, I think we're trying to understand. How does that help you? He's still disabled. He would have been disabled the day prior to that because he's still not able. And what was the rate, in effect, that would give him a higher benefit rate now? $90,000. Based on what? It never changed. When he was hired, his original hire date, he was hired in November of 1999 at a rate. The day he went back to work in January 2001, he was going back on a full-time basis. It was his intent to go back on a full-time basis, but he was never able to put in a full day's work. His intent. His intent, his hope. I think there's evidence in the record that he attempted prior to that in October of 2000 to return to work and couldn't do it. But there's nothing in the record to document the terms and conditions under which he went back to work. He just went back to work hoping to work a full week. There's considerable documentation in the record throughout 2001 that it was always E-Trades intent and expectation. So he had been off prior in 1999. I mean, in 2000, he had been off because of his surgery. He reached the point where he was ready to go back to work. He tried. No, he reached the point where he was ready to go back to the office. Yes. Right? Yes, Your Honor. Okay, when he went back to the office, he must have called somebody up and said, I'm coming back to work. Yes, Your Honor. Or did he just show up at work? I'm sure he must have made arrangements to try to return. Okay, is there anything in the record that documents what those arrangements were? Whether they changed his original compensation arrangement? Yes. There's no evidence of any change in his compensation arrangement. So is it his discretion how much time he could work during January 2001, depending on his abilities, and if he had worked the full 40 hours and one annualized that rate, it would have come out to $90,000? Yes, Your Honor. If he had been able to do so, he would have been. Okay. Let me ask you, I don't know if there's anything in the record. You can tell me if there is or not. Let me ask you a question. Prior to his employment as a full-time employee, he was a consultant, was he not? He was an independent contractor, Your Honor. All right, and what kind of hours did he work then, if there's anything in the record about that? I don't know of anything in the record evidencing how many hours he worked at that point. My understanding is he was working full-time. Was it flexible? I mean, was he working sometimes more, sometimes less, or was it similar to a full-time employee, if there's anything? I don't know of anything in the record to establish. All right. Thank you. Let me ask one follow-on then. My question then, let me ask you the same thing about the arrangement where he came back at halftime. Was that a negotiated, using that term loosely, arrangement that was worked out that his rate was dropped to $45,000 a year? The evidence in the record indicates that he went back to Kerry Boswell at E-Trade and said – I'm sorry, you can pull that down so you're not – I'm sorry. And indicated that he was not able to continue working full-time. In fact, he made the attempt and had gone home early every day, like three to five hours. So the agreement was he was at $90,000 rate, but he was going to work halftime. He would work halftime only until such time as he could return to full-time. I understand. Okay. So there wasn't any discussion, well, your $90,000 rate is now reduced to $45,000. That was just a consequence of the number of hours he was going to work. That's correct, Your Honor. All right. All right. Thank you, counsel. Thank you. Appreciate it. Thank you. Case argued as submitted. Okay. We will now be in adjournment. All rise.
judges: Fisher, Paez, Lorenz